1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ALEXANDRIA L. ERWIN,

               Plaintiff,

   v.

OBI SEAFOODS, LLC,

               Defendant.

CASE NO. 2:22-cv-00893-JHC

ORDER DENYING MOTION FOR
SUMMARY JUDGMENT

# I

## INTRODUCTION

    This employment matter comes before the Court on Defendant's Motion for Summary Judgment. *See* Dkt. # 72. Plaintiff Alexandra Erwin contends that during her employment at OBI Seafood, LLC, she experienced discrimination and harassment on the basis of race and sex, as well as retaliation. Dkt. # 32 at 1. Defendant moves for summary judgment dismissal of all her claims. For the reasons discussed below, the Court DENIES the motion.

# II

## BACKGROUND

Defendant OBI[1] operates salmon processing and canning operations across Alaska during the summer months.  Dkt. # 76 at 2.  On June 8, 2020, when Erwin was 20 years old, she began a seasonal position at an OBI fish processing facility in Egegik, Alaska.  Dkt. # 73-1 at 12–13, 14–15; Dkt. # 76 at 3; Dkt. # 89-5 at 4; Dkt. # 88 at 4.  Erwin identifies as a "white, African American, and Pacific Islander . . . non-binary woman."[2]  Dkt. # 73-1 at 1.  Egegik is a remote fishing village that can be accessed only by air or water.  Dkt. # 76 at 2.  Connectivity there is limited, with Wi-Fi limited to one room on the OBI campus and inconsistent surrounding cellular coverage.  Dkt. # 73-1 at 25–26.  During the summer of 2020, OBI's Egegik facility was a "closed campus" because of the COVID-19 pandemic, meaning employees who lived and worked at the facility could not leave the confines of the plant.  Dkt. # 89-1 at 11; *see* Dkt. # 73-1 at 170; Dkt. # 89-3 at 7–8.

Upon arrival at Egegik, Erwin was assigned to work on the "beach crew," a team that brings fish from the dock into the facility.  Dkt. # 73-1 at 31–32.  Work in Egegik during the salmon season is grueling: employees work shifts of up to 16 hours a day, seven days a week, and OBI requires employees to sign a hardship acknowledgment in preparation for the demanding labor.  *Id.* at 15–16; Dkt. # 89-3 at 7; Dkt. # 76 at 3.

Before Erwin began the season, OBI provided her with its employee handbook, including an anti-discrimination policy, which prohibits unlawful harassment, discrimination, and retaliation.  Dkt. # 73-1 at 18–20, 24; Dkt. # 89-1 at 13.  The OBI policy requires an employee

---

[1] OBI Seafoods was created following the 2020 merger of Ocean Beauty Seafoods, LLC and Icicle Seafoods, Inc.  *See* Dkt. # 76 at 2; Dkt. # 89-1 at 4.

[2] Erwin uses she/they pronouns, her preferred first name is "Sunshine," and she uses the prefix "Mx."  *See* Dkt. # 89-5 at 4.

who encounters harassment or discrimination to immediately inform the plant manager or the corporate human resources department (HR).  Dkt. # 73-1 at 18–19.  The policy also prohibits retaliation of any kind, stating that employees have the right to report issues of discrimination by: (1) reporting an incident, (2) directly addressing a harasser, or (3) emailing HR.  *Id.* at 19, 28; Dkt. # 89-2 at 6.

Erwin says that the OBI campus fostered discrimination on the basis of race and sex.  She testified at her deposition that during the season she saw a bunkbed with a "swastika symbol." Dkt. # 73-1 at 64.  Erwin also testified that OBI supervisor Terry Holmes would often say the "n-word" in her presence.  *Id.* at 54; Dkt. # 89-5 at 25.  She stated that Holmes would also speak about the Latino and Latina crew members in racist terms.  Dkt. # 73-1 at 55; Dkt. # 89-5 at 25.[3] Erwin confirmed that she did not report these racist comments because Holmes and her manager and dock foreperson, Mario Marin, were "best friends[.]"  Dkt. # 73-1 at 55–56.[4]

Erwin claims that, throughout the 2020 season, she experienced daily sexual harassment from beach crew coworker, Alex Rodriguez.  *Id.* at 35; Dkt. # 89-5 at 17.  Erwin testified that Rodriguez would "make disgusting sexual advances" to her at work and, in their shared bunkhouse, slap her "behind,"[5] and say inappropriate things to her, including that she "was feisty and [] sassy and that he knew that meant [she] was good in bed" and that he "bet it [felt] great to fuck her."  Dkt. # 89-5 at 17–20.  Erwin testified that she told Marin about Rodriguez's unwanted touching, and that he still "let [Rodriguez's harassment] happen," considering to be

---

[3] OBI employee Alandrea Curry made a similar allegation, in a separate complaint to HR, corroborating that there was antisemitic graffiti in the women's bunkhouse and that Holmes had stated various racist things, such as "Home Depot Mexicans," to the Latino and Latina employees.  Dkt. # 73-1 at 146; Dkt. # 89-1 at 9.

[4] Holmes was marked as eligible for rehire for the 2021 season.  Dkt.# 89-3 at 12.  OBI later marked him as ineligible.  Dkt. # 89-6 at 7.

[5] Erwin reports that Rodriguez did this at least three times and only stopped when she got "really violent" and "aggressive" in response.  Dkt. # 89-5 at 18.

mere banter or coworker drama. *Id.* at 18–19. Erwin said that she told beach crew supervisor, Kairy Meza, about Alex touching her "behind" and that Meza was aware of the interactions between Erwin and Rodriguez and would separate the two of them at work; Erwin felt that Meza blamed her for Rodriguez's behavior. *Id.* at 19. Erwin also testified that, at the beginning of the fishing season, to avoid these interactions, she requested to be reassigned to the cannery, but plant manager Beth Pokorny and Marin told her "that [she] should stick it out because [she] was one of the fastest flippers on the belt." *Id.*

During the 2020 season, Erwin made three complaints directly to HR. Dkt. # 73-1 at 136–44. On or around June 28, 2020, Erwin complained to Marin and HR representative, Jaimie Spetseris. Erwin reported that she did not feel comfortable being on the beach crew due to "drama" with two women, Meza[6] and Meza's friend and coworker, Alexa Green. *Id.* at 35, 42, 136. Erwin testified that the two women treated her poorly because Erwin had been texting a fisherman romantically involved with Green. *Id.* at 36–38, 152. Erwin said that because of this she was subject to Meza's "micro-aggressions," stating that Meza would often lie that Erwin was late to her shifts.[7] *Id.* at 37, 137. Erwin also said that Meza would single her out on the beach crew, assigning her to particularly uncomfortable and difficult jobs that would leave her drenched in water in freezing conditions for much longer than any other members of the beach crew. *Id.* at 136; Dkt. # 89-5 at 13. She said that in the wake of this complaint, Marin told her to stay on the beach crew and "put the drama aside," and Erwin eventually decided to remain on the crew. Dkt. # 73-1 at 136–37; Dkt. # 89-4 at 8.

---

[6] Meza and Erwin were the only two people on the beach crew who identify as being "assigned female at birth"; there were also two other members of the LGBTQIA+ community on the beach crew. *See* Dkt. # 88 at 4; Dkt. # 73-1 at 33–34.

[7] Erwin admits that she was once nine hours late to a shift because she overslept when a roommate unplugged her phone, and her alarm did not sound. Dkt. # 73-1 at 57–58; Dkt. # 89-5 at 23.

Erwin made her second complaint to Spetseris on July 10, 2020, reporting that the beach crew responded to her as if she were an "aggressive Black woman," citing tension with Meza and frustration with Marin.  Dkt. # 73-1 at 139–40.  Ultimately, HR determined that Erwin would continue with the beach crew but noted that if, "she continue[d] to be distracted by personal drama," she would be moved out of that work team.  *Id.*

Erwin testified at deposition that Meza's behavior toward her worsened over time after her first complaint and that she "got more racially profiled."  *Id.* at 38.  Erwin said that Meza would call her from the "hood," "ghetto" and "aggressive," which Erwin interpreted to be because Meza saw her as the stereotype of an "angry black woman."  Dkt. # 89-5 at 13, 26.  Erwin also stated that Meza accused her of having marijuana because Meza assumed that she was "from the hood" because of her race.  *Id.* at 14, 26–27.

Erwin reported that she did not generally feel comfortable making complaints to HR.  She testified that she first submitted her complaints to Marin, instead of Spetseris or other OBI personnel, because she viewed Marin and Spetseris as being "very close" and feared that she would suffer retaliation if she did not first report complaints to Marin.  Dkt. # 73-1 at 38.  Erwin said that "every time [she] told HR anything it would go straight back to [Marin] who then would not be happy with [her]."  *Id.* at 40.  For example, Marin "would not talk to [her] the day after [a complaint to HR]" and "his demeanor towards her would change and [her] job would be a little harder[.]"  *Id.* at 40–41.  She said that Marin would "alienate [her], separate [her,]" and treat her so badly that she eventually stopped communicating with him and HR.  Dkt. # 89-5 at 30.  Erwin testified that she "knew that it didn't matter if [she] went to HR.  It was just going to make [her] job harder if [she] complained, and if [her] manager's directly watching it happen and

not doing anything and he's best friends with HR, then who would [she] tell?"  Dkt. # 73-1 at 42.[8]

Erwin's third complaint to HR related to an incident that occurred on or around July 22, 2020, while she and Rodriguez were working together in a freezer.  *Id.* at 35, 142–44.  According to an HR incident report, Erwin stated that, during an argument related to race in the United States, Rodriguez yelled statements at her, including: "Black lives don't matter," "white power," and "white people are superior."  *Id.* at 142–44.  Erwin testified at deposition that after being subjected to Rodriguez's "vulgar" language for about two hours, which included Rodriguez's use of the "n-word" directed at Erwin, she "eventually snapped" and yelled that "he was a white privileged bitch."  *Id.* at 39, 45–46; Dkt. # 89-5 at 15–17.[9]

Erwin testified at deposition that she originally feared reporting the incident because she was isolated in Egegik, and she felt that if she spoke up, she may lose her job, housing, and be "stuck in [the] middle of a remote island."[10]  Dkt. # 73-1 at 46–47; Dkt. # 89-5 at 20.

The day after the incident, Pokorny, Spetseris, and Marin met with Erwin and informed her that she would be written up for the freezer incident, specifically because she called Rodriguez a "bitch."  Dkt. # 89-5 at 21.  Erwin testified that at this meeting, they stated that if she "spoke to any other black person on the property about what happened to [her, she] would not have a plane ride out of the plant and that not only would [she] lose [her] job but [she] would

---

[8] Erwin only reported to HR that Marin was treating her differently at the end of the season.  Dkt. # 73-1 at 51–53.

[9] According to the HR incident report, beach crew members, Mac Bonilla and Alex Sanchez, witnessed the interaction in the freezer.  Both briefly participated, making side comments.  At a certain point, Sanchez remarked: "How could someone be a slave and not do anything about it?" and then told Rodriguez and Erwin to "shut up."  Dkt. # 73-1 at 53, 142–43.

[10] Erwin did not initially report the incident and instead confided in coworker Tommy Moore, who alerted HR.  Dkt. # 73-1 at 43–44.  OBI later terminated Moore's employment because he staged a protest relating to the "Black lives don't matter" comment and general racial discrimination at the Egegik plant.  Dkt. # 89-3 at 10.  When Moore refused to leave upon termination, OBI called the Alaska state troopers to remove him from the facility.  Dkt. # 89-3 at 10.

be stuck in the marsh, and that [she] was getting [written] up for calling [Rodriguez] a bitch[.]" *Id.*  Erwin testified that they "really stressed the fact that [she] could no longer speak to any other black people on the property about what happened because [she] was causing a scene."  *Id.* Erwin testified that, in response, she pointed out that Marin regularly called the beach crew "bitches" and made jokes about raping women and animals, to which Pokorny replied that "boys will be boys[.]"  *Id.*; *see also* Dkt. # 89-7 at 10 (at deposition Pokorny stated that the word "bitch" and words that are "a lot worse" are often used at the Egegik plant because it is "a rough place").  At first, OBI disciplined Erwin and Rodriguez equally, giving them both written warnings.  Dkt. # 73-1 at 144  Yet, at the end of the summer, despite receiving the same rating of "52" on their performance evaluations, Rodriguez was marked as "eligible for rehire," while Erwin was not, as explained below.  Dkt. # 89-1 at 13–14; Dkt. # 89-7 at 11–12.

At the end of each fishing season at OBI, department managers, or forepersons conduct performance reviews of the employees, marking an employee as eligible or ineligible for rehire. Dkt. # 73-1 at 81–83, 149.  In the winter after any given summer season, OBI invites all employees marked as eligible for rehire to return for the next summer.  Dkt. # 89-6 at 4.  Being marked as ineligible typically precludes future employment with OBI, *see id.* at 8, but there is an appeal process for employees who wish to contest their classification.  Dkt. # 73-1 at 79–80.

At the end of the 2020 season, Marin first marked Erwin as eligible for rehire on her performance review sheet; but before Erwin's exit interview, Pokorny changed Erwin's status, marking her as ineligible because Marin had told Pokorny that Erwin "created too much drama" and that he did not want her to return the next year.  *Id.* at 84–85.  Pokorny and Marin then lied to Erwin at her exit interview, telling her that she was eligible for rehire, and later claimed that they lied to her because they wanted to avoid Erwin's "drama" or "bad mouthing" on the night before she left Egegik.  Dkt. # 89-7 at 14–16.  Before departure, Erwin felt confused because,

1   although she had been told she was eligible to be rehired, she noticed that she was the only

2   employee that Marin and Spetseris would not "look . . . in the eye at the end of the season."  Dkt.

3   # 89-5 at 22.

4        As for the quality of Erwin's work performance, the record is inconsistent.  Marin

5   testified at deposition that Erwin was a "below-average worker," *see* Dkt. # 89-4 at 8, reporting

6   that she "only wanted to do certain tasks," "her language was often obscene," "she was late a

7   lot," she "always seemed to be injured or wanting to go to see the medic at the infirmary," and

8   she would "leave for long periods of time."  Dkt. # 73-1 at 102.  In contrast, Erwin testified that

9   she was one of the fastest workers on the beach crew: "by the end of the season [OBI managers]

10  took everyone off the belt besides [her] and [Rodriguez] because that's how fast and efficient

11  [they] were."  *Id.* at 40.  Marin's performance review of Erwin corroborates this, stating that

12  Erwin "sorted fish with a [sense] of urgency and care" and when she "was on the belt she sorted

13  fish very well[,]" "learned her [species,]" and "helped weigh up fish between boats."  *Id.* at 149.

14       Ultimately, Erwin did not receive an invitation to return for the 2021 season, did not

15  pursue employment with OBI after the 2020 season, and filed this action on June 24, 2022.  *See*

16  Dkt. # 1.

### III
#### SUMMARY JUDGMENT STANDARDS

17       Summary judgment is appropriate if the evidence viewed in the light most favorable to

18  the non-moving party shows "that there is no genuine dispute as to any material fact and the

19  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v.*

20  *Catrett*, 477 U.S. 317, 322 (1986).  When considering a summary judgment motion, a court

21  draws "all justifiable inferences" in the non-moving party's favor.  *Anderson v. Liberty Lobby,*

22  *Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59

23

24

ORDER DENYING MOTION FOR SUMMARY JUDGMENT - 8

(1970)).  A fact is "material" if it might affect the outcome of the case.  *Id.* at 248.  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

The movant bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the movant does not bear the ultimate burden of persuasion at trial, it can show the lack of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the movant meets its burden of production, the burden then shifts to the nonmovant to identify specific facts from which a factfinder could reasonably find in the nonmovant's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

## IV
### DISCUSSION

Erwin brings these causes of action: (1) discrimination on the basis of sex and race in violation of Title VII of the Civil Rights Act of 1964 and the Washington Law Against Discrimination (WLAD); (2) retaliation in violation of Title VII and WLAD; (3) hostile work environment on the basis of race and sex in violation of Title VII and WLAD; (4) discrimination and retaliation under 42 U.S.C. § 1981; and (5) the tort of outrage.  Erwin also seeks punitive damages.  Dkt. # 32 at 10.

"[S]ummary judgment to an employer is seldom appropriate in [] WLAD cases because of the difficulty of proving a discriminatory motivation[.]"  *Scrivener v. Clark Coll.*, 181 Wash. 2d 439, 445, 334 P.3d 541 (2014).  Similarly, under Title VII, the Ninth Circuit "has set a high

standard for the granting of summary judgment in employment discrimination cases," *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996), allowing "very little evidence to survive summary judgment . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a full record." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017) (quoting *Schnidrig*, 80 F.3d at 1410 (internal quotation marks and citation omitted)). The degree of proof necessary to establish a prima facie case for a Title VII claim on summary judgment is "minimal" and "does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted). Courts should "emphasize[] the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

A.   Discrimination under Title VII and WLAD

To establish a prima facie case of race or gender discrimination under Title VII and WLAD under *McDonnell Douglas*, a plaintiff must first show that they (1) belonged to a protected class; (2) performed their job satisfactorily; (3) experienced an adverse employment action; and (4) that their employer treated the plaintiff differently that a similarly situated employee who does not belong to the same protected class as the plaintiff.[11] *See McDonnell*

---

[11] Erwin contends that the Court should consider direct evidence of OBI's discrimination rather than relying on the *McDonnell Douglas* burden-shifting framework. *See* Dkt. # 88 at 12–17. The Court declines to do so. A prima facie case of discrimination can be established either through the *McDonnell Douglas* test or via direct evidence of discriminatory intent. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985); *cf. Scrivener*, 181 Wash. 2d at 445 ("Where a plaintiff lacks direct evidence, Washington courts use the burden-shifting analysis articulated in *McDonnell Douglas* . . . to determine the proper order and nature of proof for summary judgment.") (citation omitted). The Court opts to apply the burden-shifting framework.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Douglas Corp. v. Percy Green*, 411 U.S. 792, 802 (1973); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 189 Wash. 2d 516, 527, 404 P.3d 464 (2017).  Once the plaintiff makes a prima facie showing, the burden of production shifts to the defendant employer to articulate a legitimate nondiscriminatory reason for its action.  Assuming the employer so articulates, the burden shifts back to the plaintiff to show that the proffered reasons were pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

OBI does not dispute that Erwin belongs to protected classes due to her race and gender, yet it contends that her discrimination claims fail because (1) she "did not perform her job satisfactorily"; (2) "suffered no adverse employment action"; and (3) cannot show that others outside her protected class were treated more favorably.  Dkt. # 72 at 13.

1.      Job performance

According to OBI, Erwin did not perform satisfactory work.  Dkt. # 72 at 13.  OBI asserts that Erwin was often tardy and did not work well with her team, contending that she started "confrontational conversations with others" that included "inappropriate sexually explicit conversations" and "disagreements with co-workers over romantic entanglements."  *Id.*  Erwin responds that the evidence, when viewed in the light most favorable to her, does not show that she was a poor performer.  Dkt. # 88 at 16.  The Court agrees.

Although Marin testified that Erwin was a "below-average worker," *see* Dkt. # 89-4 at 8, this conflicts with other narratives concerning Erwin's job performance.  For example, the record includes a third-party investigatory report commissioned by OBI, which corroborates that "Marin found Erwin to be a great worker" and he "felt that her ethic was good and that she did well with the crew."  Dkt. # 89-9 at 19.  Although Marin later testified at deposition that Erwin's "language

was often obscene," and "she was late a lot," *see* Dkt. # 73-1 at 102, Erwin also testified at

deposition that Meza incorrectly claimed that she was late to her shifts, when she was not, and

both Pokorny and Erwin testified at deposition that workers often used expletives in the Egegik

facility. *See id.* at 37, 137; Dkt. # 89-5 at 21; Dkt. # 89-7 at 10.  Indeed, in Erwin's performance

review, Marin wrote that Erwin "came to [him] every time she was injured" and "sorted fish with

a [sense] of urgency and care"; Marin then gave Erwin a "priority rehire score" of 52—the same

as her counterpart Rodriguez—who was marked as eligible for rehire.  Dkt. # 73-1 at 149; Dkt. #

89-7 at 11.  These facts, when viewed in the light most favorable to Erwin, present a genuine

dispute of fact as to whether she performed her job satisfactorily.

        2.      Adverse employment action

       OBI contends that Erwin fails to allege a cognizable adverse employment action, because

Erwin never reapplied for work with OBI and was not terminated or demoted before the end of

the 2020 season; OBI maintains that Erwin's rehire status had "no effect whatsoever" on her and

therefore cannot constitute an adverse employment action.  Dkt. # 72 at 14–15 (citing *Hotchkiss*

*v. CSK Auto Inc.*, 918 F. Supp. 2d 1108, 1126 (E.D. Wash. 2013)).

       Erwin responds that "she was subject to an adverse employment action when OBI laid

her off and marked her ineligible for rehire" because this classification impaired her future work

opportunities.  Dkt. # 88 at 14 (citing *Moore v. Castro*, 192 F. Supp. 3d 18, 41–42, *aff'd sub nom.*

*Moore v. Carson*, 775 F. App'x 2 (D.C. Cir. 2019)).  She contends that OBI's decision to mark

her as ineligible constitutes an adverse employment action because it harmed her ability to work

for OBI and future employers as she may be made to disclose her previous "no rehire" status in

future job applications.  *Id.* at 15.

1  "[A]n adverse employment action is one that 'materially affect[s] the compensation,

2  terms, conditions, or privileges of . . . employment.'"  *Davis v. Team Elec. Co.*, 520 F.3d 1080,

3  1089–1090 (9th Cir. 2008) (citations omitted) (plaintiff was assigned a disproportionate amount

4  of hazardous and strenuous work than her male counterparts and thus established a prima facie

5  case of disparate treatment)).

6       Adverse employment actions are not limited to cognizable employment actions
7       such as discharge, transfer, or demotion.  Some actions having been found to
       constitute adverse employment actions include: issuing undeserved performance
8       ratings, negatively affecting an employee's compensation, giving an employee a
       more burdensome work schedule, and excluding an employee from meetings,
9       seminars and positions that would have made the employee eligible for salary
       increases.

10  *Emad v. Boeing Co.*, No. C14-1233-MJP, 2015 WL 4743897, at *3 (W.D. Wash. Aug. 11, 2015)

11  (citing *Lyons v. England,* 307 F.3d 1092, 1118 (9th Cir. 2002); *Delacruz v. Tripler Army Med.,*

12  507 F. Supp. 2d 1117, 1123–24 (D. Haw. 2007); *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.

13  2000)).

14       Because it is undisputed that Erwin did not reapply for a position with OBI after she was

15  laid off at the end of the 2020 season, this is the question before the Court: is there an issue of

16  fact as to whether OBI's designation of Erwin as ineligible for rehire is an adverse employment

17  action?  Dkt. # 88 at 15.  One federal court has reasoned:

18       When a Title VII plaintiff rests a claim of adverse employment action on an event
       that *does not involve loss of pay or benefits*, the relevant question is whether the
19       employment action resulted in "materially adverse consequences affecting the
       terms, conditions, or privileges of her employment *or her future employment
20       opportunities* such that a reasonable trier of fact could conclude that the plaintiff
       has suffered objectively tangible harm."

21  *Moore*, 192 F. Supp. 3d at 41 (citing *Youssef v. FBI*, 687 F.3d 397, 401 (D.C.Cir.2012)

22  (emphasis added)); *but see Cartwright v. Lockheed Martin Util. Servs., Inc.*, 40 F. App'x 147

23  (6th Cir. 2002) (employer memorandum marking plaintiff as ineligible for rehire was not adverse

ORDER DENYING MOTION FOR SUMMARY JUDGMENT - 13

1

2

3

4

employment action when (1) employer claimed the memorandum was "erroneously prepared and that plaintiff remained eligible to seek re-employment for 24 months" and (2) no action was taken regarding plaintiff's re-employment because he was on disability leave and there was no evidence he sought re-employment).

5

6

7

8

9

10

11

12

13

14

15

The Court therefore considers whether Erwin's designation as "ineligible for rehire" resulted in adverse consequences to her future employment opportunities. This approach seems particularly apt in the context of seasonal workers. OBI's business model relies on "a large contingent of seasonal employees" to help with the summer salmon harvest. Dkt. # 89-1 at 5 (employees at OBI range from about 630 employees in the "off season" to 2500 in the fishing season). Every year, OBI lays off workers at the end of the season and "take[s workers] back on the next season." Dkt. # 89-3 at 11. Typically, employees "who finish their assignments are eligible for rehire," and the company's practice is to offer return positions to employees marked as "eligible" sometime between January and April before the next season. Dkt. # 89-2 at 8; Dkt. # 89-3 at 11 (current Egegik plant manager, Sean McKagan, testifying that OBI typically "like[s] returning employees to come back year after year.").

16

17

18

19

20

21

22

23

24

Viewing this evidence in the light most favorable to Erwin, a reasonable trier of fact could conclude that being marked as ineligible for rehire could tangibly harm an employee's future employment opportunities with OBI and could be comparable to a termination. In its reply, OBI suggests that Erwin's rehire status is not an adverse employment action because it did not materially "impact [her] future employment prospects." Dkt. # 91 at 5. Yet OBI Vice President Justin Mullins testified otherwise: he stated that he considered being marked ineligible as "a red flag" and that this might prevent someone from getting a job in this future. Dkt. # 89-6 at 8. Indeed, it is difficult to overcome this designation if a former employee wishes to return to

OBI, OBI internal procedure requires that a former employee engage in an appeal process that involves corporate HR's reversal of the designation. Dkt. # 89-3 at 5. For these reasons, with respect to the discrimination claims under Title VII and WLAD, there is an issue of fact as to whether Erwin suffered an adverse employment action.

In addition, with respect to the WLAD claim, the statutory language provides greater legal support on this issue. WLAD states that it is unfair practice for any employer to: (1) "refuse to hire" or (2) "discharge or *bar any person from employment* because of" race or sex. RCW 49.60.180(1), (2) (emphasis added). The Court must liberally construe this language, and thus concludes that a reasonable trier of fact could construe Erwin's ineligible for rehire status as a bar from employment. *See* RCW 49.60.020 ("The provisions of this chapter **s**hall be construed liberally for the accomplishment of the purposes thereof.").

3.      Favorable treatment outside protected class

OBI contends that others outside Erwin's protected class were not treated more favorably because Holmes was "deemed ineligible for rehire once an investigation substantiated an allegation [that he made] discriminatory comments[.]" Dkt. # 72 at 15. Erwin responds that the record shows otherwise because, although "OBI knew that both Rodriguez and Holmes[12] used racially derogatory language at work, both were invited back to OBI for future seasons while Erwin was not." Dkt. # 88 at 17.

The Court agrees with Erwin. As for Holmes, the record shows that HR had been informed of his comments about "Home Depot Mexicans" as early as July 26, 2020. *See* Dkt. #

---

[12] It is undisputed that Rodriguez and Holmes are not a part of Erwin's protected classes (race and sex): both are male and neither identify as African American. *See* Dkt. # 72 at 7, 15; Dkt. # 88 at 13, 18; Dkt. # 89-9 at 19.

73-1 at 146–47.  Still, Holmes was first marked as eligible for rehire and offered a seasonal job in April 2021; OBI later rescinded the offer after completing an investigation into Holmes's conduct.  Dkt. # 73-1 at 124–25; Dkt. # 89-6 at 7.  As for Rodriguez, he was also marked as eligible for rehire after the 2020 season, but he did not reapply for employment with OBI.  Dkt. # 74 at 2.  Rodriguez and Erwin were similarly situated employees, both had allegedly contentious work relationships and received the same score on their end-of-season performance review. Despite HR's documentation of Rodriguez's use of racially discriminatory language and Erwin's claim that manager Marin and supervisor Meza knew that Rodriguez subjected her to sexually assaultive behavior, Rodriguez was granted the opportunity to resume work in the following season, while Erwin was not.  Viewing these facts in the light most favorable to Erwin, a reasonable jury could conclude that Rodriguez was treated more favorably.

### 4.     Legitimate, nonretaliatory reason & pretext

If an employee satisfies the first step of the *McDonnell Douglas* framework, thus establishing a prima facie case of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's adverse action."  *McDonnell Douglas*, 411 U.S. at 802.  Because OBI says that Erwin was not marked for rehire because of her poor work performance, which constitutes such a reason, the Court turns to the third step in the framework and considers whether the evidence shows that this proffered reason is a pretext for discrimination.  *Id.* at 804.

"[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is "unworthy of credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127

(9th Cir. 2000); *cf. Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").

Viewing the evidence in the light most favorable to Erwin, a reasonable juror could conclude that OBI's reason is unworthy of credence because the record shows that she performed satisfactorily over the three-month season—or at least performed as well as others who were offered the opportunity to return.  Despite Marin's testimony to the contrary, Erwin testified that she was one of the fastest workers on the beach crew: "by the end of the season [OBI managers] took everyone off the belt besides [her] and [Rodriguez] because that's how fast and efficient [they] were."  Dkt. # 73-1 at 40.  Marin's performance review also aligns with Erwin's narrative, stating that Erwin "sorted fish with a [sense] of urgency and care" and when she "was on the belt she sorted fish very well[,]" "learned her [species,]" and "helped weigh up fish between boats." *Id.* at 149.  Erwin ultimately received a "priority rehire score" of 52—the same as her counterpart Rodriguez—who was marked for rehire.  *Id.*; Dkt. # 89-7 at 11; *Vasquez*, 349 F.3d at 641 (9th Cir. 2003) (a showing that an employer "treated similarly situated employees outside [plaintiff's] protected class more favorably would be probative of pretext"); *cf. Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001) ("An unwarranted reduction in performance review scores can constitute evidence of pretext in retaliation cases.").

Furthermore, at deposition, Pokorny stated that she marked Erwin as ineligible because Marin reported that he did not want Erwin back because "she created too much drama," which is arguably different from OBI's proffered reason that Erwin's work performance was lacking. Dkt. # 89-7 at 12.  *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (discussing *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 733–34 (7th Cir. 2001), which explains

that pretext can be shown by "not only shifting but also conflicting, and at times retracted, justifications for adverse treatment").  Also, Marin and Pokorny's shifting decisions regarding Erwin's future with the OBI—marking her as eligible for rehire, and then ineligible, only to later deceive Erwin as to her eligibility status—could be probative as to pretext.

B.    Retaliation under Title VII and WLAD

OBI says that Erwin's retaliation claims under Title VII and WLAD fail because she did not experience an adverse employment action, highlighting that she completed the fishing season, was not involuntarily terminated, nor did she suffer any material disadvantage because she did not reapply for a position with OBI.  Dkt. # 72 at 21; Dkt. # 91 at 6.  Erwin responds that a reasonable juror could find that she suffered an adverse employment action because the definition of "adverse action" in "the retaliation context is broader than in the disparate treatment realm," and includes "any employment decision that 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Dkt. # 88 at 22 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Boyd v. State*, 187 Wash. App. 1, 11, 349 P.3d 864 (2015)).

In *Burlington*, the Supreme Court held that, with respect to retaliation claims, adverse actions encompass any action that "a reasonable employee would have found [to be] materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  548 U.S. at 68.  The law is the same for WLAD retaliation claims.  *See Jin Zhu v. N. Cent. Educ. Serv. Dist.-ESD 171*, 189 Wash. 2d 607, 619, 404 P.3d 504 (2017) ("'[a]n employment action is adverse if it is harmful to the point that it would dissuade a reasonable employee from making complaints of sexual harassment or

retaliation.'") (quoting *Boyd,* 187 Wash. App. at 15, which, in turn, quotes *Burlington*, 548 U.S. at 68).

In *Brown v. Metropolitan Atlanta Rapid Transit Authority*, Brown complained about his employer's "practice of retaining and promoting white employees while attempting to get rid of African American employees," and was later terminated and not rehired despite being told that he was "qualified and had an excellent chance of being rehired." 261 F. App'x 167 (11th Cir. 2008). Brown then sued, alleging that his employer had terminated him based on racial discrimination and retaliation. Applying the standard in *Burlington*, the Eleventh Circuit reversed the district court's order granting summary judgment for the defendant, holding that the employer's acts of (1) changing Brown's employment record from "eligible for rehire" to "not eligible for rehire" and (2) changing his performance from "satisfactory" to "unsatisfactory," constituted adverse employment actions for the purpose of his retaliation claim. *Id.* at 175. The Eleventh Circuit held that "a jury could conclude that had Brown known that his complaint of discrimination would lead to his employment record being changed to 'not eligible for rehire' and/or 'performance unsatisfactory' he would have been dissuaded from making such a complaint, as would any other reasonable person." *Id.* at 176.

Similarly, in *Sink v. Wal-Mart Stores, Inc.*, a district court considered whether a plaintiff had alleged an adverse action despite having "no knowledge that he had been deemed ineligible for rehire until the discovery process." 147 F. Supp. 2d 1085, 1099–100 (D. Kan. 2001). The court held that an employer's suggestion that it would not rehire plaintiff—as noted on an exit interview form—constituted an adverse employment action "if the evidence presented at trial demonstrates, for example, that the notation on plaintiff's exit interview form was the 'kiss of death' for any future employment opportunities plaintiff may have sought with defendant." *Id.* at

1100; *see also E.E.O.C. v. Evergreen All. Golf Ltd., LP*, No. CV 11-0662-PHX-JAT, 2013 WL 4478870, *11 (D. Ariz. Aug. 21, 2013) ("The Court concludes that designating [plaintiff] ineligible for rehire was inherently an adverse employment action.").

Viewing the facts in the light most favorable to Erwin, a reasonable factfinder could conclude that had she known her complaints of discrimination to HR would lead to her "ineligible" for rehire status, she would have been dissuaded from doing so. Thus, there remains an issue of fact as to whether she suffered an adverse employment action with respect to her retaliation claims.

C.      Hostile Work Environment Under Title VII and WLAD

To prevail on a hostile workplace claim under Title VII and WLAD premised on either race or sex, Erwin must show: "(1) that [she] was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642, (citing *Gregory v. Widnall*, 153 F.3d 1071 (9th Cir. 1998)).[13]

1.      Racial harassment

OBI says that Erwin's claim of racial harassment fails because OBI's alleged conduct was not severe or pervasive. Dkt. # 72 at 17–18 (citing *Henry v. Regents of the Univ. of California*, 37 F. Supp. 3d 1067 (N.D. Cal. 2014), *aff'd*, 644 F. App'x 787 (9th Cir. 2016)).

---

[13] "A hostile work environment claim under the WLAD has substantially the same elements as a claim under Title VII." *Knight v. Brown*, 797 F. Supp. 2d 1107, 1132 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012) (citing *Davis v. W. One Auto. Grp.,* 140 Wash. App. 449, 166 P.3d 807 (2007)).

ORDER DENYING MOTION FOR SUMMARY JUDGMENT - 20

1    Erwin responds that OBI "ignores much of the evidence supporting" her claims and the record

2    before the Court raises genuine issues of material fact as to this claim.  Dkt. # 88 at 19–20.

3        In considering hostile work environment claims, courts must consider "all the

4    circumstances, including the frequency of the discriminatory conduct; its severity; whether it is

5    physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

6    interferes with an employee's work performance."  *Vasquez*, 349 F.3d at 642 (quoting *Clark*

7    *Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 270–71 (2001)); *see Faragher v. City of Boca Raton*,

8    524 U.S. 775, 787–88 (1998).

9        OBI cites *Henry*, 37 F. Supp. 3d 1067, to contend that Erwin was not subject to severe or

10   pervasive conduct.  Dkt. # 72 at 17–18.  In that case, Henry, an African American man, was

11   employed by the University of California, San Francisco for six years before filing an

12   employment discrimination suit, alleging a Title VII hostile work environment.  *Henry*, 37 F.

13   Supp. 3d at 1070.  Henry alleged various encounters with coworkers and supervisors that he

14   believed were motivated by racial animus, including: (1) a supervisor's comment that the

15   department in which Henry worked was "not going to let a black man manage anybody"; and (2)

16   the hanging of a noose on university grounds by that same supervisor.  *Id.* at 1072–74.  The

17   district court held that these incidents, which occurred over a six-year period, were "isolated

18   instances of offensive conduct" and "insufficient to create a triable issue of fact on a hostile work

19   environment claim."  *Id.* at 1084–86 (citing *Vasquez*, 349 F.3d at 642–44 ("The allegedly

20   harassing incidents, which occurred over the course of more than one year and only two of which

21   contained racially related epithets, did not create a hostile work environment for Vasquez.")).

22   Although the Ninth Circuit concluded that the "conduct was certainly objectionable, it [was] not

23

24

actionable, because the two incidents were not sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment[.]"  *Id.* at 1087.

But there is a significant difference in the durations of Erwin's and Henry's employment. And "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct."  *McGinest,* 360 F.3d at 1113 (quoting *Nichols v. Azteca Rest. Enter.,* 256 F.3d 864, 872 (9th Cir.2001)); *see Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

Erwin was employed for about three months with OBI and Henry was employed for about six years.  Erwin has provided evidence of the following documented occurrences during her short stint in Egegik: (1) the swastika on a bunkbed and supervisor Holmes saying the "n-word" and other racist phrases, which was corroborated by OBI employee Alandrea Curry, *see* Dkt. # 73-1 at 146; Dkt. # 89-1 at 9; (2) Meza's alleged negative assumptions about Erwin's race, evinced by her statements that Erwin was "hood" or "ghetto," Dkt. # 89-5 at 13, 26; (3) the beach crew's alleged treatment of Erwin as treated her an "aggressive Black woman," Dkt. # 73 at 142–43; Dkt. # 89-5 at 14; Dkt. # 89-5 at 26–27; and (4) the incident in the freezer—involving at least two other coworkers—where Rodriguez called her various racist terms, including the "n-word."  Dkt. # 73-1 at 35, 142–44.  Viewing the facts in the light most favorable to Erwin, a reasonable juror could find that these events amount to pervasive conduct.[14]  *See, e.g., Hamilton*

---

[14] OBI cites additional cases, *see* Dkt. # 91 at 9 n.5, contending that they support the notion that Erwin's allegations are merely isolated incidents of offensive conduct.  These cases are similarly distinguishable because they involve employment over a span of years.  As discussed above, the temporal scope of an employment affects the Court's analysis when considering severe or pervasive conduct.  *See Manatt v. Bank of Am., NA,* 339 F.3d 792, 797 (9th Cir. 2003) (co-workers' use of the term "China-man," ridicule of the plaintiff's mispronunciation of English words, statements that "I've had the worse[sic] kind of trouble with your countrymen," and gestures mocking the appearance of Asian people—*over a span of two-and-a-half years*—did not alter the conditions of plaintiff's employment and could not create a hostile work environment); *Kortan v. California Youth Auth.,* 217 F.3d 1104, 1110–11 (9th Cir. 2000) (holding that sexist and offensive comments made several times in plaintiff's presence, *over the course of at least five years*, could not create a hostile work environment); *Alvarado v. FedEx Corp.,* No. C 04-

*v. County of Onondaga, New York*, No. 515CV01333BKSTWD, 2018 WL 4554496, *12–*13 (N.D.N.Y. Sept. 21, 2018) (holding that plaintiff, who was a seasonal worker that completed two winter seasons of work for a total of about 10 months, had established a hostile work environment claim under Title VII after showing that he experienced racially offensive comments at the workplace, including one instance of the use of the "n-word").

The *Henry* court also doubted whether the noose found on the university grounds "served as a threat of violence to him specifically" and therefore questioned the severity of the action. *Henry*, 37 F. Supp. 3d at 1086–87.  This further distinguishes *Henry* from Erwin's case.  While Holmes's use of the "n-word" and the swastika seen in the bunkroom did not specifically target Erwin, the alleged racially motivated treatment by beach crew, Meza, and Rodriguez did.  The Ninth Circuit has recognized the severity of at least one of the words allegedly used in the freezer that day:

> It is beyond question that the [n-word] is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.  This word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.,* 270 F.3d 794, 817 (9th Cir.2001) (ellipsis in original) (quotation marks omitted); *see also Daso v. The Grafton School, Inc.,* 181 F.Supp.2d 485, 493 (D. Md. 2002) ("The [n-word] is more than [a] 'mere offensive utterance' . . . .  No word in the English language is as odious or loaded with as terrible a history."); *NLRB v. Foundry Div. of Alcon Indus., Inc.,* 260 F.3d 631, 635 n.5 (6th Cir. 2001) ("That the [n-word] is a slur is not debatable.").

*McGinest*, 360 F.3d at 1116.

---

00098 SI, 2006 WL 644875, at *15–16 (N.D. Cal. Mar. 13, 2006) (holding that one incident of being call the "n-word" by a supervisor—*during a two-year tenure*—could not allege a hostile work environment at summary judgment); *Hercules v. Dep't of Homeland Sec.*, No. C 07-0270 SBA, 2008 WL 1925193, at *20 (N.D. Cal. Apr. 29, 2008) (supervisor's use of "bitch" and the "n-word" twice, and occasional derogatory comments in the presence of plaintiff's co-workers—*over the span of ten years*—did not establish a pervasive pattern of racial slurs).

Although Meza's alleged statements are not as severe as the epithets used by Rodriguez and Holmes, the Ninth Circuit has said that the use of coded language to refer to race, such as calling an African American employee a "drug dealer," can violate Title VII. *See id.* at 1116–17 (quoting *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir. 1996)). The *McGinest* court concluded that the reference to McGinest as a "drug dealer" "might certainly be deemed to be a code word or phrase. In fact, reported cases have recognized the racial motivations behind this and other comments and slurs experienced by McGinest." *Id.* at 1117. It follows that Meza's language regarding Erwin having marijuana, being from the "hood," and that she was "ghetto," could constitute similarly coded language and is appropriate for jury consideration. *See* Dkt. # 89-5 at 14, 26–27.

Viewing the facts in the light most favorable to Erwin, there is an issue of fact as to whether she experienced conduct so severe or pervasive that it unreasonably interfered with her ability to perform at work. *See Brooks v. City of San Matteo*, 229 F.3d 917, 926 (9th Cir. 2000) ("If a single incident can ever suffice to support a hostile work environment claim, the incident must be extremely severe.").

2.      Sexual harassment

To establish a sexual harassment claim,[15] Erwin "must show she was subjected to verbal or physical conduct of a sexual nature, that was unwelcome, and that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." *Ellorin v. Applied Finishing, Inc.*, 996 F. Supp. 2d 1070, 1081–82 (W.D. Wash. 2014). A reasonable person must find the conduct to be hostile or abusive, and the Court applies

---

[15] "Sexual harassment in the form of a hostile work environment constitutes sex discrimination." *Estevez v. Fac. Club of Univ. of Wash.*, 129 Wash. App. 774, 794, 120 P.3d 774 (2005).

1    the same standards of severity and pervasiveness applicable in situations of racial discrimination,

2    as described in the section above.  *See supra* Section IV.C.1.  "[T]he conduct at issue need not be

3    as severe when frequency or pervasiveness is high."  *Ellorin*, 996 F. Supp. 2d at 1082; *see also*

4    *Glasgow v. Georgia-Pac. Corp.*, 103 Wash. 2d 401, 406–07, 693 P.2d 708 (1985) ("Casual,

5    isolated or trivial manifestations of a discriminatory environment do not affect the terms or

6    conditions of employment to a sufficiently significant degree to violate the law.  The harassment

7    must be sufficiently pervasive so as to alter the conditions of employment and create an abusive

8    working environment.  Whether the harassment at the work place is sufficiently severe and

9    persistent to seriously affect the emotional or psychological well being of an employee is a

10   question to be determined with regard to the totality of the circumstances."); *Haubry v. Snow*,

11   106 Wash. App. 666, 675–76, 31 P.3d 1186 (2001) ("To determine whether the harassment

12   affected the conditions of employment, the court considers the 'frequency of the discriminatory

13   conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

14   utterance; and whether it unreasonably interferes with an employee's work performance.'")

15   (citations omitted).

16        OBI says that Rodriguez's alleged sexual advances on Erwin were "not severe or

17   pervasive enough" to survive summary judgment.  Dkt. # 72 at 20.[16]  OBI also says that Erwin's

18

---

19   [16] OBI also states that Erwin's positive text messages about her employment at OBI, following
20   the 2020 season, demonstrated that she did not suffer any severe or pervasive treatment on the basis of
     race or sex.  Dkt. # 72 at 18–19.  At deposition, however, Erwin said that she sent such texts because she
21   "didn't want anyone to know what happened to [her] in Alaska.  It was humiliating and alienating so [she]
     tried to gloss over it the best [she] could with the people around [her] because they weren't there, like
22   [her] family and friends or whatever."  Dkt. # 73-1 at 67, 153.  Erwin said that she loved "the job itself"
     because she enjoys "hands-on labor and it was fun to be able to do labor."  *Id.* at 68; Dkt. # 89-5 at 35–26.
23   Erwin also reported that she was able to "process" what had happened in Egegik over time, and she has
     less "silenced," resulting in the filing of this action.  Dkt. # 89-5 at 36.  To be sure, this evidence presents
24   fact issues.

claim fails because she did not make any official complaint of sexual harassment by Rodriguez to HR, apart from certain comments to Spetseris that Rodriguez often "pushes her buttons and says rude things to her, but she doesn't let it bother her and doesn't do anything about it." *Id.*; Dkt. 73-1 at 142.

a.      Severe or Pervasive

Erwin testified that she experienced daily "sexual advances" both at work and in her living quarters by Rodriguez.  Dkt. # 73-1 at 35; Dkt. # 89-5 at 17.  She testified that Rodriguez slapped her behind at least three times—only stopping when she reacted aggressively in return—and said "sexually explicit" things to her throughout her time in Egegik.  Dkt. # 89-5 at 17–20.

Viewing the evidence in the light most favorable to Erwin, there are issues of fact as to whether she suffered severe or pervasive conduct based on sex.  *See, e.g.*, *Ellorin*, 996 F. Supp. 2d at 1081–82 (employee's allegations of daily unwanted comments and touching from a supervisor alleges a fact issue for plaintiff's hostile work environment claim under Title VII and WLAD); *Alvarado v. FedEx Corp.*, No. C 04-00098 SI, 2006 WL 644875, at *5 (N.D. Cal. Mar. 13, 2006) (plaintiff raised a triable issue of fact precluding summary judgment when she testified that supervisor made sexual comments on a "frequent, sometimes daily basis").

b.      Knew or Should Have Known

When "harassment by a supervisor is at issue, an employer is vicariously liable, subject to a potential affirmative defense." *Dawson v. Entek Int'l*, 630 F.3d 928, 939 (9th Cir. 2011).  But if the "harasser is merely a coworker, the plaintiff must prove that . . . the employer *knew or should have known of* the harassment but did not take adequate steps to address it." *Id.* (emphasis added) (*Swinton*, 270 F.3d at 803).

WLAD also requires that any alleged harassment be imputed to the employer. *See Dewater v State*, 130 Wash. 2d 128, 135, 921 P.2d 1059 (1996). When the person accused of harassment is not in management, the employer is not held vicariously liable unless the plaintiff shows that the person committing the harassment is an employee and the employer (1) authorized, knew, or should have known of the harassment and (2) failed to take reasonably prompt and adequate corrective action.

> This may be shown by proving (a) that complaints were made to the employer through higher managerial or supervisory personnel or by proving such a pervasiveness of sexual harassment at the workplace as to create an inference of the employer's knowledge or constructive knowledge of it and (b) that the employer's remedial action was not of such nature as to have been reasonably calculated to end the harassment.

*Id.*

Erwin testified that she told Marin about Rodriguez's unwanted touching and that he still "let [Rodriguez's harassment] happen," chalking it up to banter or mere coworker drama. Dkt. # 89-5 at 18–19. Erwin also testified that Meza was aware of the interactions between Erwin and Rodriguez and would either separate them at work or ignore what was happening; Erwin felt that Meza blamed her for the harassment. *Id.* at 19. Erwin also highlights certain HR reports and statements by others that recognized that Rodriguez and Erwin had a contentious relationship. *See* Dkt. # 73-1 at 142 (HR report that "[Rodriguez] often pushes [Erwin's] buttons"); *id.* at 143 ("[Marin] also spoke to the behavior he had seem between [Erwin and Rodriguez] as "creating a lot of tension and drama").

Viewing the facts in the light most favorable to Erwin, a reasonable juror could conclude that her manager and supervisor knew or should have known of Rodriguez's alleged sexual harassment and failed to address it adequately when they allegedly ignored the behavior.

D.     Discrimination and Retaliation Under 42 U.S.C. § 1981

Section 1981(a) provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of the laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  The Ninth Circuit recognizes "that those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797–98 (9th Cir. 2003); *see EEOC v. Inland Marine Indus.,* 729 F.2d 1229, 1233 n. 7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a . . . claim under Title VII[.]"); *Kitazi v. Sellen Constr. Co., Inc.*, No. C16-1651-MJP, 2017 WL 5455372, *3 (W.D. Wash. Nov. 14, 2017) (analyzing § 1981 discrimination and retaliation claims under the *McDonnell Douglas* framework).

1.     Disparate Treatment

Along with satisfying the *McDonnell Douglas* framework—which, as discussed above, *see supra* Section IV.A, Erwin has done—to establish a Section 1981 discrimination claim, she must also show "that, but for race, [she] would not have suffered the loss of a legally protected right."  *Brown v. King County*, 823 F. App'x 478, 480 (9th Cir. 2020) (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)).  Section 1981 protects an individual's right to "make and enforce contracts" which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(a)–(b).  "Congress intended to prevent private discriminatory deprivations of all the rights enumerated [by the statute], including the right to contract."  *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 471 (1975)

OBI says that Erwin's Section 1981 discrimination claim fails because "she has presented no evidence that any legally protected right was affected." Dkt. # 72 at 22. But there is an issue of fact as to whether, by deeming Erwin ineligible for rehire, the company affected her right to contract for employment.

OBI also says that Erwin has not established "that any action by OBI management was because of race." *Id.*; *see* Dkt. # 91 at 7. But there are issues of fact as to the "but for" question. For example, Pokorny's decision to designate Rodriguez—but not Erwin—as eligible for hire soon after the freezer incident between Erwin and Rodriguez, and Erwin's testimony that OBI management emphasized that "she could no longer speak to any other black people on the property about what happened because [she] was causing a scene," demonstrates a genuine issue of fact as to whether Erwin's race served as a "but for" cause of OBI's actions against her. Dkt. # 89-5 at 21.

### 2.    Retaliation

To establish a claim of retaliation under Section 1981, Erwin must meet the same requirements as a retaliation claim under Title VII and WLAD, first establishing that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal relationship between the two." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008*)*. Section 1981 prohibits retaliation against an employee that as complained about race discrimination. *See id.* at 1107 (plaintiff alleged that employer retaliated against her after she filed a union grievance related to race discrimination).[17]

---

[17] Defendant contends that Erwin must also show that OBI acted "with the intent to perpetuate the original act of discrimination, or with some other racially discriminatory motive in mind, then interference with rights protected by § 1981 has occurred[.]" Dkt. # 72 at 22–23 (quoting *Manatt*, 339

OBI claims that Erwin cannot "demonstrate any causal link between OBI's alleged discriminatory animus and a retaliatory act." Dkt. # 72 at 23. The Court disagrees. To establish a causal link, Erwin must show "by a preponderance of the evidence" that engaging in the protected activity—here her various reports of racial discrimination to HR—was one of the reasons OBI decided not to mark her as eligible for rehire, and that, but for the protected activity, OBI's adverse action would not have occurred. *See Villiarimo*, 281 F.3d at 1065 (citing *Ruggles v. California Polytechnic State Univ.,* 797 F.2d 782, 785 (9th Cir.1986)); *see Brown*, 823 F. App'x at 481. "[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065; *see Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone).

Here, HR recorded Erwin's complaints related to her treatment as "an aggressive Black woman" on July 10, 2020, *see* Dkt. # 73-1 at 139, and HR documented Erwin's account of the freezer incident on July 23, 2020, *see id.* at 142. Pokorny and Marin changed Erwin's rehire status from eligible to ineligible sometime between August 2 and August 4, 2020, less than a month after Erwin's first complaint and only two weeks after HR recorded Erwin's complaint related to the freezer incident. *Id.* at 149. Because OBI management's action against Erwin

---

F.3d at 800). The Court disagrees. OBI relies on a portion of *Manatt* that directly quotes *London v. Coopers & Lybrand*, a case now over forty years old. 644 F.2d 811, 819 (9th Cir. 1981) (the quoted language from *London* includes the qualifying term "if"). Just after this quote, *Manatt* concludes that because plaintiff "contends that [her employer] retaliated against her for complaining to her supervisor and to human resources about racial discrimination . . . her retaliation claim is cognizable under § 1981." *Manatt*, 339 F.3d at 800–01. Furthermore, the footnote that immediately follows the *London* quote states that "[o]ther circuits are in accord" and includes supporting parenthetical descriptions that reiterate that a retaliation claim is cognizable under Section 1981. *Id.* at 800 n.11. The Court also notes that since *Manatt*, the Ninth Circuit does not appear to have included an "intent-to-racially-discriminate" requirement when considering Section 1981 retaliation claims. *See, e.g.*, *Surrell*, 518 F.3d at 1107–08; *Bagley v. Bel-Aire Mech. Inc.*, 647 F. App'x 797, 800 (9th Cir. 2016).

happened "on the heels" of her complaints, Erwin has established an inference of "but for" causation. *See Miller v. Fairchild Indus.,* 885 F.2d 498, 505 (9th Cir. 1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (1987) (evidence of causation existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended).

E.      Tort of Outrage

        To establish a claim for the tort of outrage or intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Seaman v. Karr,* 114 Wash. App. 665, 684, 59 P.3d 701 (2002).  "The conduct in question must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*" Id.* (quotations and emphasis removed).  Whether conduct is sufficiently outrageous is typically a question for the jury.  *Id.*

        OBI contends that Erwin's outrage claim should be dismissed because her claimed experiences during the fishing season were not "so outrageous" to be considered "utterly intolerable in a civilized community."  Dkt. # 72 at 23–24 (citing *Grinenko v. Olympic Panel Prod.*, No. C07-5402BHS, 2008 WL 5204743 (W.D. Wash. Dec. 11, 2008)).  OBI suggests that it is merely "inappropriate" to subject an African American employee to racial slurs, such as "white power," "white people are superior," "the n-word," and "Black lives don't matter."  *See* Dkt. # 73-1 at 142–46.

Yet when viewing the facts in the light most favorable to Erwin, there is a genuine dispute over whether Erwin's allegations constitute only "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities do not constitute actionable outrage." *Candelore v. Clark Cnty. Sanitation Dist.*, 975 F.2d 588, 591 (9th Cir. 1992).  A reasonable trier of fact could find that an employee subjected to racial epithets and sexual advances throughout her three months at the OBI facility, suffered outrageous, extreme, and intolerable treatment.

For example, in *Thompson v. N. Am. Terrazzo, Inc.*, a work crew supervisor called workers on his crew many racist terms, such as the "n-word" and "wetback"; when considering the tort of outrage, the *Thompson* court clarified that it had "no difficulty concluding that the evidence of [the supervisor's] racial insults, viewed in the light most favorable to the Plaintiffs, were sufficiently outrageous, extreme, atrocious, and intolerable to allow a jury to decide [the] outrage claims."  No. C13-1007RAJ, 2015 WL 926575, at *13 (W.D. Wash. Mar. 4, 2015). Although Rodriguez and Erwin were not in a supervisor-supervisee type relationship, this distinction does not make a legal difference when observing the parallels between the alleged racial insults that allegedly permeated the Egegik plant and those in *Thompson*.  A reasonable juror could therefore conclude that Erwin experienced conduct "beyond all possible bounds of decency," precluding summary judgment on this claim.

F.      Punitive Damages

Erwin also seeks punitive damages.  Dkt. # 32 at 10.   Under Title VII and Section 1981, she may recover punitive damages if she shows that OBI "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights[.]"  42 U.S.C. § 1981a(b)(1).  "[A]n employer must at least discriminate *in the face of a perceived risk that its actions will violate federal law* to be liable in punitive damages."

*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (emphasis added).  "Congress intended for punitive damages to apply in intentional discrimination cases where the plaintiff can show that the employer *knowingly or recklessly* acted in violation of federal law.*"  Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1197 (9th Cir. 2002) (citing *Kolstad*, 527 U.S. at 535) (emphasis added).  The Court must focus on the "employer's motive or intent, rather than an objective inquiry into whether the employer's behavior is 'egregious.'" *Id.*

Even when a plaintiff has established a claim for punitive damages, an employer may assert a "good faith" defense, "enabling it to escape punitive damages" if it can show that the challenged actions were (1) not taken by senior managers *and* (2) were contrary to the employer's good faith implementation of an effective antidiscrimination policy.  *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002), *aff'd*, 539 U.S. 90 (2003) (citations omitted).  OBI asserts this defense, contending that Erwin is not entitled to punitive damages because "there is no evidence any senior managers acted with knowing or reckless intent to violate" her Title VII or § 1981 rights. Dkt. # 72 at 24–25.  OBI says that it followed its anti-discrimination and anti-harassment policies and "diligently" responded to all claims brought to HR by Erwin, disciplining its employees accordingly investigating. *Id.*  Erwin responds that "a reasonable jury could conclude that OBI discriminated and retaliated against [her] in the face of a perceived risk that its actions violate[d] federal law." Dkt. # 88 at 24.

First, as to what constitutes a "senior manager," the Court concludes that a reasonable juror could find that plant manager Pokorny constitutes an OBI "senior manager" but that neither Marin nor Meza are not sufficiently "senior" under the punitive damages standard.  In *Kolstad*, the Supreme Court relied on the common law of agency to assess whether an employee serving in a "managerial capacity" committed any alleged wrongs while acting in the scope of

employment so as to "impute liability for punitive damages to respondent."  527 U.S. at 543.
The Supreme Court recognized that the Restatement (Second) of Torts § 909 did not include a
"good definition" of the term "managerial capacity" and observed that this was ultimately a
"fact-intensive inquiry."  *Id.* at 543.  *Kolstad* confirmed that courts must examine "the type of
authority that the employer has given to the employee, the amount of discretion that the
employee has in what is done and how it is accomplished."  *Id.* (citations omitted).  *Kolstad* also
recognized that although an employee must be "important," for liability purposes, the employee
need not be the employer's "top management, officers, or directors," to be act "in a managerial
capacity."  *Id.* (remanding the issue of whether the acting head of the office where plaintiff
worked, was serving in a "managerial capacity").[18]  In *Passantino*, the Ninth Circuit also
remanded the fact issue of "managerial capacity" to the district court, stating that if a vice
president of sales and national account manager were "sufficiently senior," they may be treated
as an employer's proxy for liability purposes.  212 F.3d at 516.[19]

Here, viewing the facts in the light most favorable to Erwin, a reasonable juror could
conclude that Pokorny had sufficient authority and discretion as plant manager to be considered a
"senior manager" for purposes of punitive damages.[20]   For example, Pokorny was responsible
for performing the performance evaluations of all Egegik departmental manager that reported to
her, she was also responsible for signing off on all end-of-season performance evaluations
performed by those departmental managers.  Dkt. # 89-7 at 6–7.  Pokorny would then serve as

---

[18] OBI does not contend that OBI employees acted outside the scope of their employment.

[19] The term "senior manager" was not used in *Kolstad*, but first appeared in *Passantino*, 212 F.3d 493.  In *Passantino*, the Ninth Circuit, relying on the principles in *Kolstad*, assessed how "senior" and "managerial" certain actors were to see if they could be treated as proxies for their corporate employer for liability purposes.  *Id.* at 516.

[20]  The record does not show that Rodriguez (beach crew worker), Spetseris (HR representative), Marin (dock foreperson and Erwin's direct manager), or Meza (beach crew supervisor) had the discretion or authority to be considered "senior managers" for this damages inquiry.  *Id.*

the link between Egegik and OBI corporate, sharing all evaluations with the Seattle corporate office. *Id.* A reasonable juror could conclude that Pokorny held a good deal of discretion and authority, especially when considering she had the ability, a final say, in designating any Egegik employee as eligible or ineligible for rehire.

There is also a genuine dispute whether Pokorny "*knowingly or recklessly* acted in violation of federal law.*" Hemmings*, 285 F.3d at 1197. In *Passantino*, plaintiff was employed at Johnson & Johnson, where she became "one of its most successful female managers." 212 F.3d at 499. Despite her qualifications and positive performance reviews, Passantino began to believe that she was being passed over for promotions because of her sex, which led to her make both informal and formal complaints to her employer. *Id.* at 500. At certain meetings following these complaints, Passantino's supervisors showed her doctored performance ratings of her male counterparts, which inflated their performance ratings to justify why her male colleagues were better compensated. *Id.* at 502. Johnson & Johnson then offered Passantino jobs below her level and had no "potential for salary growth." *Id.* at 503. When assessing whether the issue of punitive damages should have been presented to the jury, the Ninth Circuit held that:

> An application of *Kolstad*'s intentional discrimination requirement to the facts here leaves no doubt that punitive damages are available. The jury had substantial evidence based upon which it could find malice or reckless indifference to Passantino's federally protected rights. The jury could have found that [Johnson & Johnson] *downgraded Passantino's promotability status and offered her demotions in retaliation* for her complaints. The jury also could have found that *defense witnesses lied (both to Passantino and at trial) about their actions*, as part of a continuing effort to cover up their campaign against her, including giving her false or misleading information about potential jobs as well as about salaries, and that [Johnson & Johnson's] actions against [another employee] suggested a pattern of similar action. These actions are sufficient to permit a jury to conclude that [Johnson & Johnson] *could not have reasonably believed* that its conduct was lawful.

*Id.* at 515–16 (emphasis added).

ORDER DENYING MOTION FOR SUMMARY JUDGMENT - 35

Here, as in *Passantino*, OBI management lied to Erwin regarding her future employment opportunities with the company. *See* Dkt. # 89-7 at 14–16. Although Pokorny stated that she deceived Erwin because she wanted to avoid Erwin's "drama" or "bad mouthing" of the company on the night before her departure, *see id.*, a reasonable juror could conclude that Pokorny and Marin lied to Erwin regarding her rehire status—while also marking Rodriguez (a person outside of Erwin's protected classes of race and sex) as eligible for rehire—to conceal a discriminatory motivation. OBI Vice President Mullins also recognized at deposition that Pokorny and Marin did not "properly conduct themselves" when they were not "forthright" with Erwin. Dkt. # 73-1 at 128–29. In addition, according to Erwin, following the freezer incident, Spetseris, Pokorny, and Marin told her that she would be further punished if she spoke to any other African American employees about what had happened in the freezer. Dkt. # 89-5 at 21. These facts, taken in the light most favorable to Erwin, could permit a jury to conclude that Pokorny could not have reasonably believed her actions were lawful, raising a genuine dispute of fact as to whether Pokorny knowingly or recklessly acted in violation of federal law on the basis of Erwin's race and sex.

Finally, there is a genuine dispute whether Pokorny's challenged actions were contrary to OBI's good faith implementation of an effective antidiscrimination policy. *See Costa*, 299 F.3d at 864. Still "it is well established that it is insufficient for an employer simply to have in place anti-harassment policies; it must also implement them." *E.E.O.C. v. Les Schwab Tire Centers of WA, Inc.*, No. C06-0045RSM, 2010 WL 148370, at *2 (W.D. Wash. Jan. 11, 2010) (citing *Passantino*, 212 F.3d 493).

The record shows that OBI provided its seasonal workers a copy of its anti-discrimination policy before the season opened and held a one-hour HR training on the workers' first day at Egegik. *See* Dkt. # 73-1 at 18–23; Dkt. # 89-1 at 13; Dkt. # 89-9 at 9, 22. Erwin testified that,

during her first day orientation, Spetseris "sped through the harassment policies" and did not provide the new employees with a hardcopy of the policy.  Dkt. # 73-1 at 21–22.  At summary judgment, these actions merely suggest OBI notified its employees of its policies and provided a cursory training, without more, they do not show OBI's good faith policy implementation.  *See Les Schwab Tire Centers*, 2010 WL 148370, at *3 ("[T]he deposition excerpts offered by the parties create an issue of fact as to defendants' good faith, an issue which requires resolution by the jury.").  For these reasons, Erwin's punitive damages claims related to Pokorny's actions are inappropriate for dismissal on summary judgment.

## V

### CONCLUSION

For these reasons, the Court concludes that genuine disputes of material fact preclude the dismissal requested by Defendant.  Accordingly, the Court DENIES the motion for summary judgment.  Dkt. # 72.

Dated this 15th day of March, 2024.

John H. Chun
United States District Judge

ORDER DENYING MOTION FOR SUMMARY JUDGMENT - 37